UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>  Plaintiff, )<br>)<br>  v. )<br>)<br>HILTON LIVINGS JR., )<br>)<br>  Defendant. ) | No. 4:14CR119 RWS (DDN) |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE PURSUANT TO FRANKS V. DELAWARE**

COMES NOW the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Cristian M. Stevens, Assistant United States Attorney for said District, and for its response to defendant's memorandum in support of his motion to suppress evidence pursuant to Franks v. Delaware, states as follows:

## I.   INTRODUCTION

Defendant argues that "the affidavit in support of the search warrant in this case contained material falsehoods and omissions made knowingly and intentionally or with reckless disregard for the truth."  Defendant's Memo. at 1 (citing Franks v. Delaware, 438 U.S. 154 (1978)). Accordingly, defendant demands suppression of the evidence seized pursuant to the search warrant.

Defendant's Franks motion should be denied.  First, the search warrant does not contain any material falsehoods or omissions.  Rather, defendant's numerous half-baked allegations of Franks violations will be found to be frivolous.  Second, as already established at the lengthy

1

evidentiary hearing on October 28, 2014, and in a number of pleadings, even if such falsehoods or omissions existed (they do not), the search warrant was supported by probable cause.

## II.   ARGUMENT

### A.   Defendant Cannot Show That the Search Warrant Affidavit Contained an Intentional or Reckless False Statement or Omission.

According to Franks v. Delaware, 438 U.S. 154, 155-56 (1978), before a defendant is entitled to a hearing on his allegations, he must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant."  Furthermore, the reviewing magistrate judge must determine that the allegedly false statement was necessary to the finding of probable cause.  See id.; United States v. Jansen, 470 F.3d 762, 765-66 (8th Cir. 2006); United States v. Sandoval-Rodriguez, 452 F.3d 984, 988 (8th Cir. 2006).  As defendant now concedes, "Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." Defendant's Memo. at 3 (quoting United States v. McIntyre, 646 F.3d 1107, 114 (8th Cir. 2011)).

**1.   The Search Warrant Affidavit Recited that the Informant Was Documented.**

Defendant's first basis for claiming that "there are numerous provably false statements in [the search warrant] affidavit," Trans. 3, 9, is that the search warrant affidavit omits sufficient information regarding the reliability of the informant.  Defendant's Memo. at 4-6.  As a preliminary matter, this obviously is no basis for a Franks violation.  Rather, the issue is fully briefed in the Government's response to defendant's memorandum in support of his motion to suppress evidence.

At any rate, the affidavit clearly states, and defendant now concedes, that Detective Bret Carlson "was contacted by a confidential informant (C/I) who is documented through the St. Louis

2

Metropolitan Police Department[.]"  Defendant's Memo. at 3 (quoting Ex. 1).  Defendant apparently abandons his tortured reading of the search warrant affidavit, which suggested that the informant was not previously documented by the St. Louis Metropolitan Police Department, notwithstanding the plain language of the affidavit.  See Defendant's Motion to Suppress Evidence and Statements and Request for a Franks Hearing at 4 (hereinafter, "Defendant's Motion").

At the lengthy hearing on October 28, 2014, Detective Carlson stated that the informant was documented with the police department before the instant investigation.  He went on to explain, as any issuing judge would know, that a documented informant has met with the police officer documenting him, has undergone a review of his criminal history, and has executed an informant agreement.  The informant is required to provide and verify his name, date of birth, and other information.  He then signs a "binding contract" with the police department, in which he promises, among other things, not to relinquish any information regarding his work as an informant to any third party.  Trans. 21-22.

Counter-intuitively, defendant insists that the affidavit "allows an inference that 'documented' corresponds to 'reliable,'" and "it's presence in the affidavit can only reasonably be inferred to act as an [sic] substitute for reliability."  Defendant's Memo. at 4, 5; see also id. at 5 ("[T]he word "documented" functions in the affidavit as an indicator of reliability.").  As a matter of law, defendant is exactly correct: The Eighth Circuit has "long accorded known informants more credence than anonymous or confidential informants."  United States v. O'Dell, 766 F.3d 870, 874 (8th Cir. 2014) (noting that, while informant was not identified by name in search warrant affidavit, "his identity was known to law enforcement at the time the affidavit was prepared"); see

3

also <u>United States v. Stevens</u>, 530 F.3d 714 (8th Cir. 2008) (holding "hearsay information included in the affidavit provided sufficient indicia of reliability to support a finding of probable cause," and noting that informants "identified themselves and voluntarily provided in-person statements to the affiant officer").

Thus, the now uncontroverted text of the affidavit, which states that the informant previously was documented with the St. Louis Metropolitan Police Department, cannot be a basis for a <u>Franks</u> violation.

### 2. That the Informant Was Paid Is Not a <u>Franks</u> Violation.

Defendant's second issue is that the affidavit omits that the informant was paid for information.  Of course, defendant is aware that the informant was paid only because Detective Carlson readily disclosed as much at the hearing.   Trans. 182.

Defendant apparently fails to understand that whether the informant was paid, and whether that fact was included in or omitted from the affidavit, is entirely irrelevant.   The Eighth Circuit has held that "an affidavit is not robbed of its probative effect by its failure to mention that the informant 'was a paid informant who avoided prosecution by virtue of her testimony.'"   <u>United States v. Williams</u>, 477 F.3d 554, 558 (8th Cir. 2007) (quoting <u>United States v. Milton</u>, 153 F.3d 891, 896 n.3 (8th Cir. 1998)); <u>see also</u> <u>United States v. Wold</u>, 979 F.2d 632, 635 (8th Cir. 1992) ("[Affiant] did not inform the magistrate issuing the warrant that [confidential informant] had been a drug dealer for a number of years, was cooperating with the police in order to receive leniency, and was being paid by the police.   This Court has held, however, that omissions such as these are not misrepresentations.").[1]

---

1    Given the law, the complete omission from defendant's pleadings of the fact that the

The Eighth Circuit explained in United States v. Reivich, 793 F.2d 957, 962-63 (8th Cir. 1986), a seminal case on the issue, that inclusion of the details of a deal between an informant and a police officer in a search warrant affidavit would add little to consideration of the informant's reliability.  This is so because the judicial officer issuing the warrant is expected to take into account the typical kind of bargaining between informants and police officers, and "we expect such judicial officers to be only neutral and detached – not naïve and ingenuous."  Id. at 963; see also Wold, 979 F.2d at 635 ("Judicial officers issuing warrants are aware of deals made with informants who themselves are facing charges.  Therefore, failure to inform the issuing officer of a deal is not fatal to the validity of the warrant.").

Thus, defendant again imprudently has accused Detective Carlson of a Franks violation, which, as a matter of law, simply is not.

### 3. The Search Warrant Affidavit Sufficiently Described the Premises.

Defendant's third allegation is that the affidavit refers to only a single front door and omits of any reference to the second front door at 4716 Louisiana.  Defendant protests that "behind which door illegal activity was thought to be happening is clearly critical to the determination of probable cause to search behind one of them, and the omission of that information constitutes reckless disregard for the truth."  Defendant's Memo. at 6.

Ironically, as defendant accuses Detective Carlson of recklessly omitting the second door from the affidavit, defendant conspicuously omits any reference to the fact that the second door was boarded up at the time of the surveillance and the execution of the search warrant.  Trans. 43,

---

informant was not motivated by any desire to "work off a case" or any similar motivation is no less problematic than the omission from the affidavit of the fact that the informant was paid.  Trans. 182.

103. Defendant altogether fails to mention that, although the building's address was displayed in two places, the numbers were "identical," meaning 4716 Louisiana bore only one address. Trans. 44. Defendant also curiously overlooks that Detective Carlson observed construction consistent with the conversion of the building into a single residence, apparently explaining the informant's description of the building. Trans. 43, 102-104.

Finally, that the omission of the second door from the search warrant was intentional or even reckless seems unlikely, given that all of defendant's drug activity was observed at the other door, the detectives avoided entering the downstairs apartment when they discovered it, all of the evidence seized during the search came from defendant's apartment or his person, and Detective Carlson included in the affidavit defendant's driver's license address of 2827 Texas Avenue, despite that it was not favorable to the investigation. Trans. 29-30, 53, 55, 56, 71, 81-83.

### 4. The Affidavit Accurately Described the CrimeMATRIX Search.

Like defendant's abandoned effort to twist the plain language of the affidavit regarding the documentation of the informant, defendant's next issue turns on a hyper-technical misreading of the affidavit. It is axiomatic that "affidavits for issuance of a search warrant should be examined under a common sense approach and not in a hyper-technical fashion." United States v. Ventresca, 380 U.S. 102, 109 (1965); United States v. Dukes, 758 F.3d 932, 936 (8th Cir. 2014); United States v. Rodriguez, 711 F.3d 928, 936 (8th Cir. 2013).

The first page of the affidavit consistently refers to defendant as "Hill," because Detective Carlson had not yet determined that "Hill" was defendant. At the bottom of the page, Detective Carlson stated, "Armed with [the informant's] information, I conducted an inquiry of "Hill" through the CrimeMATRIX computer system." Ex. 1. Defendant insists that this must mean

6

that Detective Carlson literally used the term "Hill" as his search term in CrimeMATRIX. Because defendant has been unable to find the search term "Hill" used in CrimeMATRIX, he leaps to the conclusion that Detective Carlson must be lying.   Defendant's Memo. at 7.

In fact, in testimony apparently disregarded by defendant, Detective Carlson repeatedly volunteered that, when he conducted the inquiry regarding "Hill" in CrimeMATRIX, he purposefully avoided using the word "Hill" as a search term.

Detective Carlson initially established that "Crime Matrix is a computer system that links people by phone numbers, residence, vehicles, anytime they've been stopped by police, anytime they've been arrested and various – and links them to other people.   It's just a really good search engine to try and locate somebody."   He continued that CrimeMATRIX contains a lot of information, and there are a lot of different ways to conduct searches.   Trans. 27.

On cross-examination, he reiterated, "I didn't have Hilton Livings' name, so I either went through an address, I went through a phone number, I went through any fact to get ahold of that name."   Trans. 51.

Again, on re-direct, Detective Carlson elucidated that he ran a number of different searches through CrimeMATRIX and, depending on precisely what search he did, he got different results. Trans. 106.   More specifically, he made clear that he did not input the search term "Hill," because such a search would have been "too big of a vast search" with too many irrelevant results.   Trans. 114.

Defense counsel was fully aware that Detective Carlson "didn't run Hill – and you told me that before.   You didn't run Hill in the Crime Matrix system, correct?"   Detective Carlson agreed that he "didn't run the nickname because there may be way too many hits.   There may be too

7

many Hills that come in variation." Trans. 164.  He elaborated, "The way I worded that, all I knew that man as is Hill. . . .  So I inquired about that gentleman through the computer system, whether it was running the address, whether it was running the information the CI gave me, I was inquiring as to who Hill was.  I didn't mean actually I went through the Crime Matrix and ran Hill." Trans. 165.

Finally, when defense counsel returned to the subject a fourth time, Detective Carlson again explained, "That's what I'm trying to tell you, that the informant could have given me a phone number, could have given me anything.  I could have ran it through the address.  Crime Matrix is a big, like spaghetti bowl of links and avenues how to get his name. . . .  I meant I went to Crime Matrix and inquired as to the identity of the person I know as Hill.  So I went through our Crime Matrix trying to find out who this Hill is, is what I'm saying.  I didn't just go and type Hill and alias and click submit, because I know you'll get an umpteen million [results], and usually 80 to 90 percent of people aren't documented under what they go by on the street." Trans. 166-167.

Detective Carlson's repeated, common sense explanations of the clear language of the affidavit are nowhere to be found in defendant's memorandum.

**5. The Informant Viewed a Photograph of Defendant on January 6, 2014.**

Defendant's fifth argument is a fabrication.  Defendant informs this Court that "Detective Carlson swears in his affidavit that he showed the confidential informant the picture of Mr. Livings in the affidavit on January 6, 2013 [sic]."  Defendant's Memo. at 7 (emphasis added).  Defendant goes on to point out that the photograph contained in the affidavit is a driver's license photograph from the Missouri Department of Revenue, claims that Department of Revenue records show that "Detective Carlson was not in possession of the photograph included in the search warrant until

8

January 8, 2013, [sic]" and even attaches the photograph as an exhibit to his memorandum.  From this, defendant concludes that Detective Carlson lied about showing the photograph to the informant on January 6.  Defendant's Memo. at 7-8.

First, defendant simply makes up that Detective Carlson swore in his affidavit that he showed the informant the same picture contained in the affidavit.  The affidavit plainly states, "On January 6th [2014], I made contact with the C/I and presented to him/her photographs of the above identified subject Hilton Livings."  Ex. 1.  Not only does the affidavit not specify that the photograph shown to the informant is the same photograph contained in the affidavit, it states that Detective Carlson showed the informant "photographs," plural.  Defendant does not bother to identify how or when Detective Carlson obtained those photographs.

Second, even assuming that the driver's license photograph contained in the affidavit was among the photographs shown to the informant, defendant overlooks that Detective Carlson could have obtained the photograph from an earlier computer search, or from another database, or from multiple databases.  We need not speculate, because when asked, "[D]o you know how you came about that particular photograph?," Detective Carlson responded, "It's either LEWeb, which is another computer search, which is our REJIS or Crime Matrix.  It's probably one of his booking photos or his driver's license photo."  Trans. 28.  He went on to explain, "To get his driver's license I would have ran him through LEWeb, though, and that's where your license information pops up."  Trans. 28.  He agreed that "this might be a combination of several different computer searches."  Trans. 29, 31.

Defendant's allegations regarding the photograph, misquotation of the affidavit, and mischaracterization of the record are malicious and unfounded.

9

### 6. The Dates of Surveillance Are Mere Typographical Errors.

Defendant argues that the typographical errors regarding the dates on which the detectives conducted surveillance amount to the sort of deliberate or reckless false statement envisioned by Franks.   To the contrary, Detective Carlson repeatedly testified that the errors were mere "typographical" or "grammatical" errors.   Trans. 32, 33-34, 52, 55, 57.   He also made clear that the typographical errors were unintentional, and not intended to mislead the issuing judge.   Trans. 144.   As even defendant acknowledges, "the affidavit was presented to both a Circuit Attorney and a judge with these glaringly obvious mistakes," and "[t]hese dates were not merely erroneous; they were obviously impossible."   Defendant's Memo. at 8-9.   Thus, that they were typographical errors is obvious.

The Eighth Circuit has instructed that "a mere typographical error does not establish a 'deliberate falsehood,' or a 'reckless disregard for the truth,' nor does it cast doubt on the affidavit's showing of probable cause to search the residence."   United States v. Butler, 594 F.3d 955, 961-62 (8th Cir. 2010); see also United States v. White, 356 F.3d 865, 869 (8th Cir. 2004); United States v. Edwards, 994 F.2d 417, 424-25 (8th Cir. 1993); United States v. Valentine, 984 F.2d 906, 909 (8th Cir. 1993).

### 7. The Detectives Surveilled 4716 Louisiana.

For his seventh issue, defendant "questions whether the surveillance referenced in the affidavit actually took place."   Defendant's Memo. at 9.

First, defendant rehashes his third argument and misrepresents that "the residence appeared, for all purposes, to have been a two-family residence not a single-family residence." Defendant's Memo. at 9.   As already explained, the informant told Detective Carlson that the

10

residence was converted from a two-family residence to a single-family residence. Detective Carlson testified that the second door was boarded up at the time of the surveillance and the execution of the search warrant, and that the "identical" address was posted in two places on the building. Ex. 1, Trans. 43, 44, 103. Obviously, that the second door was boarded up and the building displayed only one address are not indicative, "for all purposes," of a two-family residence.

Second, defendant seeks to resurrect his already debunked fifth argument that Detective Carlson lied about showing a photograph to the informant. This time, defendant characterizes the issue as the mere "absence of any evidence" that Detective Carlson was in possession of a photograph of Mr. Livings. Defendant's Memo. at 9. As explained, either iteration of the argument is frivolous.

Third, defendant focuses on two paragraphs of the instant affidavit, as compared to two paragraphs of an affidavit dated February 11, 2014, and admitted as Defendant's Exhibit S. Trans. 192. Just as at the hearing, defendant highlights the similarities of the two paragraphs, and gives the differences short shrift. For example, defendant disregards that the two paragraphs contain different dates of surveillance, different residences under surveillance, and different targets. Defendant minimizes that the separate surveillances revealed a red colored sedan and two black females traveling south on a different street on a different date on one occasion, and a dark colored sedan and two white males traveling west on a different street on a different date on another occasion. Defendant is incredulous that the detectives could have observed "a black female wearing a dark colored jacket" on two different streets, on two different dates, during the winter months of January and February. Exs. 1, S. Instead, defendant misrepresents that

11

"[t]here are absolutely no differences in the last day of observation between the two cases." Defendant's Memo. at 10. From this, defendant concludes, "It is much more likely that the affidavits were simply copied and pasted."[2]

Notably, defendant does not parse the dozen or so other paragraphs of the two affidavits, which are substantially different. More importantly, defendant compares the instant affidavit to only Defendant's Exhibit S, without mention of the other three affidavits admitted as Defendant's Exhibits T, U, and V. Trans. 192-193. Regarding those three affidavits, defense counsel conceded at the hearing such things as, "[t]his one is a little bit different," "the description's a little different," and "[t]he other ones have slightly more detail as far as what they observed." Trans. 151. As the Government explained at length at the hearing, the instant affidavit differs from all the others, in particular Defendant's Exhibit T. Trans. 154-161.

In the final analysis, that these affidavits (or any other previous affidavits, for that matter) are similar in many respects is not indicative of anything nefarious. Detective Carlson readily acknowledged that his investigations regarding felons with firearms and narcotics often are very similar, and that the targets of his investigations commonly employ similar methods to deal drugs. Trans. 15, 24-25. Specifically, Detective Carlson typically acts on informant information within one week and does not specify the date on which he received the information to avoid endangering the informant. Trans. 20-21. After receiving the information, he typically conducts, CrimeMATRIX, LEWeb, REJIS, I/Leads and other computer searches. Trans. 27, 30, 35-36.

---

2   Defendant's pending Motion to Compel Disclosure of the Identity of the Government's Confidential Informant (doc. 20) is nothing more than a form motion "copied and pasted" from a motion filed by defense counsel's office on October 22, 2010, in United States v. Mark Edwin Shores, 4:10CR449 CEJ (doc. 22). That fact alone (setting aside other obvious lapses) does not render the information copied and pasted therein any less true.

After conducting the computer inquiries, his standard practice is to meet with the informant to determine if the informant can identify a photograph of the target. Trans. 31. If the informant identifies the target, Detective Carlson then typically conducts at least three surveillances, because "[t]he Circuit Attorney's Office likes a minimum of three surveillances." Trans. 33. He routinely obtains additional information from the informant within 72 hours of seeking a search warrant, because "that's the maximum allowed by the Circuit Attorney's Office" and further specifying the date on which the informant received the information could endanger the informant. Trans. 37-38. Finally, Detective Carlson usually asks the informant whether the target carries a firearm in connection with his drugs, because "it's an important fact, certainly, that the handgun is connected to the defendant actually packaging the drugs." Trans. 38-39. For all of these reasons, Detective Carlson explained, his search warrant affidavits in these kinds of cases "appear to be in the same or similar format." Trans. 189-190.

Finally, regarding the surveillance about which defendant has "questions," defendant obtained Detective Carlson's duty records from the police department in a transparent effort to prove that Detective Carlson did not conduct the surveillance when he said he did. Defendant did not disclose the records to the Government. At the hearing, the records revealed not only that Detective Carlson was on duty on the dates and times that he said he was, but that he came in early on January 9, 2014, to obtain and execute the search warrant and to "do [his] job that day." Ex. 8; Trans. 127-131, 188.

### 8. The Affidavit Properly Sets Forth the I/Leads Search.

Defendant next complains about the affidavit's description of an I/Leads database search conducted by Detective Carlson. Defendant's Memo. at 11-12.

13

The affidavit explicitly states that the search "revealed multiple calls for service <u>at and near</u> 4716 Louisiana Ave.," including calls for "Shot Fired," "Suspicious Person," and "Drug Sales." Ex. 1 (emphasis added).   Undeterred, defendant argues that "Government discovery of an I/Leads search for <u>the address of</u> 4716 Louisiana failed to support that calls for 'Drug Sales' were found." Defendant's Memo. at 11 (citing Ex. Q) (emphasis added).[3]   The obvious problem with defendant's argument is that Exhibit Q is limited to "the address of" 4716 Louisiana, while the affidavit refers to service "at and near" 4716 Louisiana.

Worse, defendant utterly ignores that Government's Exhibits 6 and 7, I/Leads records for "at and near" 4716 Louisiana, contain all of the calls specified in the affidavit, including a call for individuals selling drugs.   Exs. 6, 7; Trans. 118-125.   In fact, Detective Carlson testified, and the exhibits proved, that there were literally dozens of calls for police service at and near 4716 Louisiana, including eight shots fired incidents and six calls for suspicious persons.   Exs. 6, 7; Trans. 120.   Specific to 4716 Louisiana, the records displayed a number of calls, including a call for suspicious persons and two calls for shots fired.   Ex. 6; Trans. 121-122, 187.

Defendant characterizes the inclusion of this circumscribed I/Leads information in the affidavit as "an absolutely fraudulent use of the information."   Defendant's Memo. at 12. Defendant takes issue with the twelve-month duration of the I/Leads results, yet provides no evidence that defendant lived there for a shorter duration.   Defendant levels the ridiculous claim that the "at and near" language is so distinguishable from the immediate block surrounding the building as to be a <u>Franks</u> violation.   Defendant attacks the "complete lack of foundation or

---

3   Throughout his memorandum, defendant seeks to rely, with varying degrees of accuracy, on documents produced by the Government in discovery.   He apparently misses the irony of defense counsel's profession of ignorance regarding the discovery rules and outright refusal to reciprocate.   Trans. 7, 8.

14

follow up on any of the calls," despite that the affidavit stated merely that the I/Leads system "revealed multiple calls for service" and that "there have been calls," without seeking to vouch for their ultimate disposition. Ex. 1, Defendant's Memo. at 11. The affidavit did not overstate the I/Leads results. To the contrary, the affidavit was "relatively conservative" in describing the substantial criminal activity at and near 4716 Louisiana. Trans. 125.

Again, defendant's issue regarding the I/Leads search turns on a mischaracterization of the affidavit and the I/Leads records, and selective references to the record, at best.

### 9. The Search Warrant Affidavit Sufficiently Described the Premises.

For his ninth, and final, claimed Franks violation, defendant returns a third time to his argument that the affidavit's description of the residence was deficient. Defendant's Memo. at 12. The Government has addressed the issue supra and will not do so again.

### B.   The Search Warrant Was Supported by Probable Cause.

Regardless of defendant's various claims of false statements and reckless omissions, the remaining information in the search warrant affidavit is sufficient to establish probable cause. See United States v. Williams, 477 F.3d 554, 557-61 (8th Cir. 2007) (stating defendant, to suppress evidence, must show allegedly false statement in search warrant affidavit was necessary to finding of probable cause); United States v. Mathison, 157 F.3d 541, 547-48 (8th Cir. 1998) (same).

With respect to the probable cause supporting the search warrant, defendant repeats, yet again, that the affidavit "makes no claim of observation of criminal activity during the claimed surveillance." Defendant's Memo. at 12. Yet again, the Government refers the Court to the controlling case law. See O'Dell, 766 F.3d at 874 ("It is well established that even the

15

corroboration of minor, innocent details can suffice to establish probable cause."); Stevens, 530 F.3d at 719 ("The corroboration of even innocent, minor details can support a finding of probable cause."); United States v. Morales, 923 F.2d 621, 625 (8th Cir. 1991) ("This Court has repeatedly stated that the presence of probable cause does not depend on the verification of illicit or even furtive activity; the corroboration of minor details can suffice to establish probable cause.").

Defendant similarly claims that perhaps the women Detective Carlson surveilled briefly entering 4716 Louisiana were defendant's live-in girlfriends. Remarkably, defendant suddenly gives credence to the informant's information that defendant lived with two girlfriends at 4716 Louisiana. The issue is moot because Detective Carlson confirmed, upon searching the residence, that the individuals engaged in foot traffic to and from the residence were not defendant's girlfriends. Trans. 56. Furthermore, Detective Carlson's surveillance was entirely consistent with the informant's description of defendant's drug activity, as well as with drug traffic observed by Detective Carlson over the course of his career. Trans. 34.

As already established ad nauseam in the Government's response to defendant's original motion to suppress evidence and statements and request for a Franks hearing, and in the Government's response to defendant's memorandum in support of his motion to suppress evidence, there is no doubt that the allegations in the affidavit provided probable cause to believe that defendant possessed and sold drugs, and possessed a handgun, at 4716 Louisiana.

Defendant cannot establish that an intentional or reckless false statement or omission was included in the search warrant affidavit. Nor can defendant establish that, even assuming such a false statement or omission, the search warrant affidavit otherwise lacked probable cause. Therefore, defendant's motion should be denied.

16

### III.   CONCLUSION

For the foregoing reasons, this Court should deny defendant's motion to suppress evidence pursuant to Franks v. Delaware.

> Respectfully submitted,
>
> RICHARD G. CALLAHAN
> United States Attorney
>
> s/ *Cristian M. Stevens*
> CRISTIAN M. STEVENS #48028MO
> Assistant United States Attorney
> 111 South Tenth Street, Room 20.333
> St. Louis, Missouri 63102
> (314) 539-2200

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this 11th day of December, 2014, to Diane Dragan, Assistant Federal Public Defender, 1010 Market Street, Suite 200, St. Louis, MO 63101.

> s/ *Cristian M. Stevens*
> ASSISTANT UNITED STATES ATTORNEY